| **Brown v Berookhim** |
|:---:|
| 2024 NY Slip Op 33832(U) |
| October 25, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 805238/2019 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  **HON. JOHN J. KELLEY**

*Justice*

-------------------------------------------------------------------------------X

RALPH V. BROWN,

                     Plaintiff,

           - v -

BOBACK M. BEROOKHIM, M.D., LENOX HILL HOSPITAL,
and NORTHWELL HEALTH,

                  Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| PART | 56M |
| INDEX NO. | 805238/2019 |
| MOTION DATE | 10/10/2024 |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 65, 66, 67, 68, 69

were read on this motion to/for                JUDGMENT - SUMMARY        .

      In this action to recover damages for medical malpractice based on departures from good and accepted medical practice, lack of informed consent, and negligent hiring, retention, and supervision, the defendants Boback M. Berookhim, M.D., and Lenox Hill Hospital (together the Lenox Hill defendants) move pursuant to CPLR 3212 for summary judgment dismissing the complaint insofar as asserted against them.[1]  The plaintiff opposes the motion.  The motion is granted only to the extent that the Lenox Hill defendants are awarded summary judgment dismissing the negligent hiring and retention cause of action insofar as asserted against them, and so much of the medical malpractice cause of action as was premised upon their alleged failures (a) properly to perform the surgery that is the subject of this action, (b) timely to diagnose a post-operative infection, and (c) timely to refer the plaintiff for hyperbaric therapy. The motion is otherwise denied, inasmuch as there are triable issues of fact as to whether Berookhim performed a contraindicated procedure, whether he departed from accepted

---

[1] On May 16, 2022, the plaintiff discontinued the action against the defendant Northwell Health.

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

Page 1 of 27

standards of care in their post-operative monitoring and treatment of the plaintiff, whether he obtained the plaintiff's fully informed consent to the procedure, whether those departures and failure to obtain informed consent caused or contributed to the plaintiff's injuries, and whether Lenox Hill Hospital (LHH) is vicariously liable for Berookhim's acts.

The crux of the plaintiff's claims is that, between March 2, 2017 and December 29, 2017, Berookhim committed malpractice in recommending that the plaintiff undergo a prosthetic penile implant procedure, in the manner in which Berookhim performed the procedure, and in the manner in which Berookhim provided him with post-operative care. He further alleged that Berookhim failed to obtain his fully informed consent to the procedure, and that LHH negligently hired, retained, trained, and supervised its health-care employees.

In his bill of particulars, the plaintiff alleged that Berookhim negligently recommended that he undergo a penile implant by failing properly to determine if he was an appropriate candidate for that type of surgical procedure. He further alleged that Berookhim performed the penile implant on March 2, 2017 in a non-sterile, contaminated environment at LHH, thus causing the penile prosthetic implant to become infected, and thereafter failed timely and properly to diagnose that the penile prosthetic implant had indeed become infected. In this regard, the plaintiff alleged that Berookhim departed from good practice in failing to heed and pay attention to his post-operative complaints of penile and testicular pain, redness, and swelling and, consequently, failed timely and properly to treat and remove the infected penile prosthetic implant. The plaintiff further alleged that Berookhim also committed malpractice in causing and permitting the undiagnosed and untreated infection to develop into necrotic tissue and gangrene on and in his penis. He also faulted Berookhim for failing timely and properly to refer him for hyperbaric treatment to augment healing of the necrotic tissue and, instead, waited too long before making a referral such that such treatment was provided too late to have any beneficial effect.

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 2 of 27**

[* 2]

In his bill of particulars, the plaintiff asserted that, as a consequence of the these alleged departures from good practice, he was required to undergo additional surgical interventions, consisting of multiple debridements and, ultimately, a partial amputation of his penis. Specifically, the plaintiff alleged that he was obligated to undergo a partial penectomy and surgical debridements secondary to a Candida glabrata infection at the implant site, which caused or induced penile necrosis, cellulitis, and gangrene, along with glans necrosis. The plaintiff additionally asserted that he suffered from penile pain, scrotal pain and swelling, a ureteral fistula, urinary tract infections, and abnormal urination with spraying, all of which necessitated additional surgical intervention under general anesthesia, consisting of a urethromeatoplasty, requiring the temporary placement of a suprapubic tube, a peripherally inserted central catheter, and a Foley catheter for several days subsequent to the surgery. In addition, the plaintiff averred in his bill of particulars that the various surgeries induced hypoxemia, acute respiratory distress syndrome, pleural effusion, pneumonia, anemia secondary to blood loss, and the need for blood transfusions. He further claimed to have suffered from a loss of sexual function, consisting, among other things, of the inability to engage in sexual intercourse, as well as a concomitant deformity of his penis, embarrassment, depression, and anxiety. The plaintiff also alleged that the injuries caused by Berookhim's malpractice likely will necessitate further surgical interventions.

With respect to the plaintiff's lack of informed consent claim, he alleged, in his bill of particulars, that Berookhim failed to obtain his fully informed consent to the penile implant procedure by failing to inform him of the risks associated with the procedure, specifically, that he could end up with a completely infected penile implant, develop necrotic and gangrenous tissue in his penis, require an amputation of his penis, lose his sexual function, and suffer from abnormal urination. He further asserted that Berookhim failed to inform him that the procedure could result in the need for multiple, additional corrective surgeries and, instead, negligently told

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 3 of 27**

3 of 27

him that the subject procedure was a simple one. The plaintiff also averred that, had he been fully informed of these potential risks, he would not have undergone the surgery.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr*., 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp*., 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 4 of 27**

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp.*, 10 AD3d 521, 522 [1st Dept 2004]). Where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and such insufficient care or delay proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . . pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]). To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009];

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 5 of 27**

5 of 27

[* 5]

*Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]). If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]). Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id.*, quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]). Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr.*, 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]). Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

The Lenox Hill defendants established their prima facie entitlement to judgment as a matter of law by submitting the pleadings, the plaintiff's bill of particulars, transcripts of the

**805238/2019 BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No. 001**

**Page 6 of 27**

[* 6]

parties' deposition testimony, relevant medical records, and the affirmation of expert urologist Peter J. Stahl, M.D.

In his affirmation, Dr. Stahl described Berookhim's examination and vetting process for determining whether the plaintiff was a candidate for a prosthetic penal implant procedure, and addressed the issues of whether the procedure was performed in accordance with the applicable standard of care, and whether Berookhim satisfied the standard of care with respect to post-operative examination, diagnosis, and follow-up treatment. He concluded that Berookhim did not depart from the applicable standard of care in any manner, and that nothing that he did or did not do caused or contributed to the plaintiff's alleged injuries.

Dr. Stahl first noted that, prior to seeking treatment from the defendant urologist Berookhim, the plaintiff was treated by primary care physician Michael Correa, M.D., whose records reflected that the plaintiff had a medical history significant for Type 2 diabetes, coronary artery disease, and hypertension, and that the plaintiff had smoked for many years. As Dr. Stahl interpreted the relevant records, Dr. Correa managed and treated the plaintiff's diabetes and other health conditions, and ultimately referred the plaintiff to Berookhim for treatment of erectile dysfunction and decreased urination.

As set forth in the plaintiff's medical records, on January 6, 2016, the plaintiff presented to Berookhim, reporting a history of failed medical therapies for erectile dysfunction, such as Viagra, and expressed an interest in a penile prosthesis. According to Dr. Stahl, Berookhim advised the plaintiff that his diabetes likely was the cause of his erectile dysfunction, and that an elevated blood sugar level could lead to poor wound healing, while uncontrolled diabetes increased the risk of infection after the proposed surgery. Dr. Stahl further noted that, upon Berookhim's recommendation, the plaintiff underwent a renal and bladder ultrasound scan on January 13, 2006, with unremarkable results, although the plaintiff's A1C levels, measuring his blood sugar, were somewhat elevated. A March 1, 2016 cystoscopy revealed a normal urethra and normal bladder outlet. As of May 26, 2016, the plaintiff's A1C level was 10.4%.

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**                    **Page 7 of 27**
**Motion No.  001**

7 of 27

The plaintiff's cardiologist, Vivian Abascal, M.D., noted, in a chart that Berookhim later reviewed, that she had performed cardiac catheterization and stenting on the plaintiff on August 12, 2016, and that, on November 22, 2016, she again saw the plaintiff for a preoperative evaluation for the anticipated placement of a penile prosthesis. According to Dr. Stahl, Dr. Ascabal documented no contraindications for surgery and no need for cardioprotective antibiotic prophylaxis, and she described the plaintiff as a moderate-risk patient for a low-risk surgery, as his A1C level continued steady at 10.4%.

On March 2, 2017, the plaintiff presented to LHH for an inflatable prosthetic penis (IPP) implantation surgery by Berookhim. A pre-surgical history and physical examination documented that the plaintiff then was 60 years old, was 5'7" tall, and weighed 209 pounds, had a body mass index of 30.2, and a history of hypertension, coronary artery disease with stent placement, myotonic dystrophy type 2, obesity, and erectile dysfunction, along with a 30-year, one-pack-per-day smoking habit, alcohol intake of one or two drinks per day, and prior use of cocaine and marijuana. At 1:25 p.m. on that date, the plaintiff was taken to the LHH operating room, upon which he was administered general anesthesia, along with the antibiotics Gentamycin at a dosage of 240 milligrams (mg) and Vancomycin, via an intravenous push bolus. Following a 10-minute mechanical chlorhexidine skin preparation, Berookhim's assistants applied Chloraprep to the surgical area, and then administered a 40-milliliter (ml) mixture of 0.25% Marcain to induce an erection, after which Berookhim noted a mild right-sided sloping curvature of the penis. A Foley catheter was then inserted, after which Berookhim made 2-inch infrapubic incision, with dissection of the bilateral corpora cavernosa, dilated both sides, and took measurements both proximally and distally within each side of the penis. Berookhim then placed the IPP and tested the level of inflation.

In his operative notes, Berookhim reported an "excellent cosmetic result," albeit "with a sloping right-sided curvature." As Dr. Stahl interpreted the plaintiff's chart, Berookhim thereupon implemented certain surgical maneuvers, after which Berookhim reported

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 8 of 27**

improvement in the curvature. Berookhim created space for the IPP reservoir, which was filled with 80 ml of saline solution, then placed a pump in the plaintiff's scrotum, and conducted repeated tests to ensure that the device was functioning properly. A 7-millimeter (mm)-long Jackson-Pratt drain was placed at the surgical site, and Berookhim or his assistants then sutured the surgical wound, applied a dressing, and transferred the plaintiff to the recovery room. The surgical procedure took slightly more than one hour to complete, and the administration of anesthesia was discontinued 10 minutes after completion of the surgery, although the Lenox Hill defendants maintained the plaintiff post-operatively on 4 mg of morphine via one intravenous push, followed two 5-mg Percocet tablets every 6 hours, as needed for pain relief. They also administered an antibiotic Bactrim tablet orally once every 12 hours. According to the Lenox Hill defendants, LHH staff monitored the plaintiff throughout the remainder of that day, without any complications.

On March 3, 2017, after testing revealed that the plaintiff's vital signs remained normal, and that his white blood cell count was decreasing from otherwise high levels, thus suggesting the absence of a spreading infection, the Lenox Hill defendants allegedly provided the plaintiff with discharge instructions as to dietary restrictions and physical activity, directives to keep his scrotum elevated with scrotal support and to use ice packs, maintain his incisions in a clean, dry, and intact condition, along with instructions as to how to bathe properly, and what to look for in case of infection, including fever, pain, purulent discharge, warmth, redness, and swelling of the surrounding skin. The Lenox Hill defendants further advised the plaintiff that if he developed a fever greater than 100.4° F., or noted any other changes or worsening of his condition, he was to immediately call his doctor or report to the LHH emergency department. They scheduled the plaintiff for a follow-up appointment with Berookhim, and counseled him on smoking cessation. Upon discharge, the plaintiff was prescribed the stool softener and laxative Colace (100 mg), the antibiotic Bactrim (800 mg), and the painkiller Percocet (325 mg). The patient was discharged home at approximately 3:43 p.m. on March 3, 2017.

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**                    **Page 9 of 27**
  **Motion No.  001**

9 of 27

[* 9]

As Dr. Stahl interpreted the medical records, the plaintiff missed his first post-operative appointment, which had been scheduled for March 17, 2017, and instead presented to Berookhim on March 22, 2017. Berookhim reported that the plaintiff had stopped using the scrotal support on March 5, 2017 "due to discomfort," but nonetheless complained of persistent, significant swelling and pain commencing immediately after surgery, that purportedly had decreased by this first post-operative appointment. According to Berookhim, the plaintiff reported that he occasionally took ibuprofen and Percocet for pain relief. Berookhim reported that, at the first follow-up visit, the plaintiff's penis and scrotum were edematous, which Berookhim attributed to the plaintiff's noncompliance with instructions to wear the scrotal support. Dr. Stahl asserted that the IPP could not be inflated due to swelling, but reiterated Berookhim's conclusion that there were, at that time, no clinical signs of infection. Berookhim testified at his deposition that he instructed the patient on proper scrotal support, reinforced his instructions with respect to the need to watch for signs of infection, and scheduled a second follow-up visit for two weeks hence.

According to Berookhim, on April 3, 2017, the plaintiff reported a significant decrease in swelling, but continued to complain of pain, upon which Berookhim advised him to take ibuprofen (600 mg) and provided him with a prescription for 10 additional Percocet tablets. The plaintiff returned for a follow-up visit on April 5, 2017, allegedly reporting that his pain had improved but that he still had soreness, although he denied that he experienced fever, chills, or drainage from the surgical site. As Berookhim characterized it, by April 5, 2017, after the plaintiff had employed the scrotal support for several weeks, the hematoma had decreased in size. At his next follow-up visit on April 19, 2017, the plaintiff reported persistent scrotal and perineal pain and complained that, although he was able to self-inflate the IPP, he could not locate the deflation button, in response to which, according to Berookhim, the plaintiff was educated on the use of the prosthesis. Berookhim reported that, upon examination, the hematoma had continued to decrease in size, and there was no evidence of infection.

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No. 001**

Page 10 of 27

10 of 27

Berookhim prescribed a refill of ibuprofen and Percocet, and scheduled a follow-up visit for May 19, 2017, which according to Berookhim, the plaintiff did not keep.

On June 2, 2017, the plaintiff, while on vacation, called Berookhim and reported that his pain had become unbearable, upon which Berookhim advised him immediately to report to a local emergency room or urgent care center, in response to which the plaintiff reportedly insisted on returning to LHH. The plaintiff presented to the LHH emergency department on June 3, 2017, complaining of pain across his lower back and severe pain and infection at the penile implant site, and reported extreme difficulty in sitting or lying down, increased swelling and pain to his phallus over the prior few weeks, and difficulty with urination and general mobility. Examination by LHH staff revealed that the plaintiff's glans penis was tender to palpation, with ecchymosis and bloody discharge in his underwear. Berookhim arrived in the emergency department, examined the plaintiff, and reported that the plaintiff had significant penoscrotal edema and skin changes in the distal phallus/glans, specifically, that the phallus, scrotum, and pump space were swollen and edematous. Berookhim testified at his deposition that the plaintiff's condition was "emergent," since there was purulent fluid in the penis and pump, necessitating immediate removal of the IPP. According to Berookhim, the extent of the swelling, the gangrenous changes, and the urinary complications suggested that the infection had developed at least several days, and maybe weeks, earlier.

As Dr. Stahl interpreted the plaintiff's chart, as of June 3, 2017, the plaintiff's white blood cell count was 20,000, his A1C level was 12.2%, and computed tomography (CT) imaging reflected the presence of significant lymphadenopathy, while Berookhim diagnosed the plaintiff with a clinically infected penile prosthesis, with skin changes involving the glans. Berookhim apparently assessed the plaintiff as a poor candidate for salvage surgery given the glans changes and concern about glans ischemia. According to Dr. Stahl's interpretation of the operative report, general anesthesia was commenced, and preoperative and intraoperative antibiotics Zosyn and Vancomycin were administered. Berookhim reported the presence of

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**                    **Page 11 of 27**
**Motion No.  001**

[* 11]

11 of 27

purulent fluid in the space below the infrapubic scar, the pus was aspirated and sent for analysis, the IPP was removed, and the wound was fully examined, with no additional pockets having been identified. He further explained that the wound was irrigated with antibiotic fluid, while a Foley catheter, as well as one Jackson-Prate and two Penrose drains, were placed. The surgery took approximately 90 minutes to complete. According to Berookhim's deposition testimony, hyperbaric oxygen therapy was then not indicated given the extent of the infection.

Immediately subsequent to the completion of the June 3, 2017 procedure, the plaintiff was admitted to the surgical intensive care unit, and was followed by specialist physicians, including infectious disease specialists. On June 8, 2017, Berookhim performed a bedside debridement on the plaintiff's surgical site, and reported the presence of purulent discharge from the ventral aspect of the base of the glans, as well as eschar at the distal penis. On June 9, 2017, Berookhim reported that he suspected that the Foley catheter was exerting pressure on the glans and retarding the healing process at an already poorly vascularized site. He reportedly developed a plan to place a suprapubic tube to divert the urinary stream and allow urination with decreased risk of reinfection. At a follow-up visit on June 20, 2017, Berookhim reported the presence of fibrinous exudate over the ventral, distal phallus near the corona, characterized the eschar as stable, clean, and dry, and concluded that the infection appeared to have resolved. With respect to the plaintiff's ongoing complaints of spraying during urination, Berookhim concluded that there was a distal urethral fistula secondary to infection and poor blood supply, and speculated that the severity of the proximal edema may have contributed to "strangulation" of the distal penis, with contributing factors that included poorly controlled diabetes and cardiovascular disease. That same day, the plaintiff was taken to the operating room, where the suprapubic tube was removed, the plaintiff was re-catheterized, and his penis was debrided until granulation tissue was identified. According to the relevant operative records, cultures from the surgery grew Candida galbrata, Enterobacter cloacae, and Coagulase-negative staphylococci bacteria, after which Berookhim placed the plaintiff on a

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**                      **Page 12 of 27**
**Motion No.  001**

[* 12]

course of the antibiotic meropenem and the antifungal micafungin. The Lenox Hill defendants discharged the plaintiff on June 27, 2017.

When the plaintiff next presented to Berookhim on July 5, 2017, Berookhim reported that the plaintiff's incision was clean and dry and beginning to demarcate, but, on July 17, 2017, Berookhim reported that the dry gangrene that he previously had observed was unchanged, and that he discussed with the plaintiff the possibility that the plaintiff might need a partial penectomy due to loss of vasculature in the glans. On July 20, 2017, the plaintiff again was admitted to LHH. Berookhim, after administering the antibiotic Vancomycin, performed a partial penectomy on the plaintiff. Following completion of the procedure, the plaintiff was discharged to the post-anesthesia care unit, reportedly in stable condition, with continued intravenous administration of the antibiotic Zosyn. Berookhim allegedly advised the plaintiff that his glans necrosis had been dissected to tissue, and that this tissue may or may not prove viable to allow the underlying glans a chance to restore. According to Berookhim, he told the plaintiff to follow up with his primary care physician, take his regular medications and antibiotics, maintain glycemic control, and stop smoking. On July 25, 2017, Berookhim referred the plaintiff for hyperbaric treatment.

During August 2017, although the plaintiff had made appointments for follow-up examinations by Berookhim and a consultation with plastic and reconstructive surgeon Wojciech Dec, M.D., he either canceled or missed those appointments, although he remained in contact with Berookhim. On August 16, 2017, the plaintiff allegedly reported to Berookhim that he was not taking anticholinergic drugs to treat urinary incontinence, nor had he seen his primary care physician. He purportedly next saw Berookhim on August 23, 2017, at which time he reported that he was experiencing right testicular pain and tenderness. According to Berookhim, he observed redness and swelling, and thus suspected that the plaintiff was suffering from orchitis, whereupon he instructed the plaintiff to report to LHH's emergency department. Although the plaintiff apparently cancelled a debridement procedure that had been scheduled for August 24, 2017, he was treated at LHH between August 28, 2017 and August 30, 2017 for a cystic

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 13 of 27**

[* 13]

collection and a moderate right hydrocele, in connection with which he was administered Zosyn. After placing a peripherally inserted central catheter (PICC) for administration of intravenous drugs, LHH thereupon discharged the plaintiff, instructed him to follow up with Berookhim and LHH specialists in endocrinology and infectious diseases, and arranged for home-nursing care. Relevant records reflect that the Lenox Hill defendants treated the plaintiff with intravenous antibiotics between September 7, 2017 and November 7, 2017. According to the Lenox Hill defendants, after being treated for approximately four weeks of treatment with meropenem, there was a clinical resolution of the plaintiff's infection.

Dr. Stahl unambiguously opined that Berookhim did not depart from the standard of care in recommending the placement of an IPP, since neither diabetes nor a smoking addiction constituted a contraindication to the procedure, even though performing that procedure on a heavy smoker was "less than optimal." Dr. Stahl concluded that the plaintiff's lack of success with Viagra, a drug used to treat erectile dysfunction, rendered the IPP procedure the last, best option for regaining sexual function and enhancing his quality of life. He further approved of Berookhim's assessment that the plaintiff was "as optimized as possible prior to surgery in light of his underlying comorbidities," and asserted that Berookhim appropriately referred the plaintiff to specialists in cardiology and internal medicine to evaluate and clear him for the elective IPP procedure, since the plaintiff's A1C level was "as low as [the plaintiff] was able to achieve."

Dr. Stahl further asserted that Berookhim took sufficient precautions to avoid infection prior to surgery, adequately prepared the plaintiff for the placement of an IPP, and provided instructions to use a special antiseptic soap for showering and to shave the surgical area in advance of surgery. Moreover, he asserted that, prior to the initial surgery, Berookhim correctly administered antibiotic prophylaxis to the plaintiff. As Dr. Stahl explained it,

> "[w]ith respect to claims that Dr. Berookhim performed the surgery in a non-sterile environment, I find this claim to have no basis in fact. The record reflects that an antibiotic protocol was followed, with Mr. Brown receiving Vancomycin and Gentamycin via IV push prior to and during surgery. Moreover, the penile prosthesis inserted by Dr. Berookhim has an antibiotic coating to reduce potential

**805238/2019 BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No. 001**

**Page 14 of 27**

14 of 27

for infection. Virtually every IPP sold in the last 15 years is coated with antibiotics and the device infection rate has dropped to 1% or less. There is also no evidence to show that any of the surgical instruments were unsterile. Moreover, appropriate, and adequate precautions were taken by Dr. Berookhim and LHH to minimize the risk of infection in the post-operative period. Blood tests the day after surgery showed an initial white blood cell (WBC) count of 24 down-trending to 20.4 in a follow-up test. This was not indication of infection but rather a normal metabolic elevation commonly seen after surgery."

Dr. Stahl asserted that, after insertion of an IPP, there is always swelling and pain, no matter the patient or the surgeon who places the implant, as these symptoms are "attendant with insertion of a foreign body in a sensitive area." He expressly rejected the plaintiff's claims that Berookhim was negligent in the postoperative period by failing to heed the plaintiff's complaints and timely diagnose that the prosthetic was infected. Rather, he opined that the treatment rendered by Berookhim during the postoperative period was well within the standard of care. In this respect, he faulted the plaintiff himself for missing his first postoperative appointment on March 17, 2017, and discontinuing his usage of scrotal support three days after the March 2, 2017 surgery due to discomfort. Dr. Stahl also asserted that, although Berookhim appropriately advised the plaintiff to look for signs of infection, and identified the nature of such signs, at each of the March 22, 2017, April 3, 2017, and April 5, 2017 appointments, Berookhim correctly concluded that an infection was not present.

Upon noting that the plaintiff ultimately was able to inflate the prosthesis on April 19, 2017, but had difficulty locating the button to deflate his erection, Dr. Stahl stated that such a circumstance was "concerning," since the prosthesis and the penis remain rigid for too long when that occurs, which can decrease blood flow and cause a loss of perfusion. Nonetheless, Dr. Stahl asserted that Berookhim correctly instructed the patient on use of the device, properly scheduled him for close monitoring with respect thereto, and properly monitored the plaintiff's post-surgical pain, documenting the absence of redness, warmth, or discharge, which he characterized as signs that would indicate infection. He opined that the infectious process diagnosed on June 3, 2017 had commenced well before the plaintiff's June 2, 2017 telephone

805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.
Motion No. 001

Page 15 of 27

15 of 27

call to Berookhim, as the operative report with respect to the June 3, 2017 surgery, along with CT imaging, "clearly demonstrate the significant swelling, gangrenous changes, and lymphadenopathy present in the LHH ED on June 3rd, indicating the infection had been developing over the course of days if not weeks."

Dr. Stahl also attributed the failure to arrest or slow the course of the infection to the plaintiff's failure to follow up with any physician between April and June 2017, and the final, adverse course of the infection to the plaintiff's refusal to present to an urgent care clinic near where he was vacationing, "leading to decreased blood flow with necrosis and gangrene causing tissue loss and need for a partial penectomy." He opined that,

> "[b]y failing to contact his surgeon and return to Dr. Berookhim's offices prior to June 3rd, Mr. Brown deprived the defendant doctor of a chance to timely treat the infection which could have resulted in a better outcome. Dr. Berookhim was deprived of the ability to monitor and assess Mr. Brown's prosthesis and penis and to make necessary changes in the patient's care."

As Dr. Stahl described it, when the plaintiff finally did go to the LHH emergency room on June 3, 2017, LHH personnel timely and appropriately evaluated him and quickly contacted Berookhim, who timely and appropriately evaluated the plaintiff, informed him of the "concerning state" of his infected prosthesis and penis, and timely transferred the plaintiff to the operating room to remove the prosthesis.

With respect to plaintiff's claim that he was not timely referred for hyperbaric oxygen therapy, Dr. Stahl concluded that the plaintiff was not an appropriate candidate for such therapy until his wound had fully demarcated, and all devitalized tissue had been removed, allowing the locus of injury to demonstrate an ability to heal. In this respect, he noted that, during June 2017 and July 2017, the plaintiff was still being managed for an active infectious process, with necessary debridements undertaken as necrosis continued to evolve. He thus asserted that, when Berookhim finally referred the plaintiff for such treatment on July 22, 2017, it was within the standard of care, but noted that hyperbaric oxygen therapy for a necrotizing soft tissue infection would only be indicated for an acute situation and that, by that time, and in light of the

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No. 001**

**Page 16 of 27**

fact that the initial surgical debridement occurred in June 2017, hyperbaric oxygen therapy was not necessary for his treatment.

Dr. Stahl ultimately opined that Berookhim did not depart from the standard of care in any aspect of his examinations, consultations, recommendations, preoperative preparation, surgical technique, or postoperative monitoring and care, and that nothing that he did nor did not do in these respects caused or contributed to the plaintiff's infection, injuries, or need for additional surgeries. The Lenox Hill defendants thus made a prima facie showing of entitlement to judgment as a matter of law with respect to the medical malpractice cause of action.

In opposition to that showing, however, the plaintiff raised triable issues of fact with respect to whether the IPP surgery was indicated, and whether Berookhim provided appropriate postoperative monitoring and care, by submitting the verified bill of particulars, the complaint, and the affidavit of board-certified urologist Michael P. O'Leary, M.D., who opined that the plaintiff was a poor candidate for penile implant surgery at the time that it was performed, and was at high risk for developing a postoperative infection due to his significant pre-existing co-morbidities, particularly, his pre-existing poorly controlled diabetes and smoking addiction. He further concluded that, as a consequence of performing a contraindicated procedure, and failing adequately to monitor and treat the plaintiff post-operatively, the plaintiff did, in fact, develop a post-operative infection, requiting emergent explantation of the IPP, and causing the subsequent development of gangrenous and necrotic tissue, requiring multiple surgical debridements of the penis, and ultimately requiring partial amputation of a significant portion of the penis, among other complications.

While Dr. O'Leary agreed with Dr. Stahl that the risk of a postoperative infection in a generally healthy male following a penile implant surgery is 1%, he noted that the risk of infection in a well-controlled diabetic patient is more than double that risk, "while the risk of infection to an uncontrolled diabetic patient is substantially greater than that." Dr. O'Leary also faulted Berookhim for recommending that the plaintiff proceed with the IPP implant surgery, and

**805238/2019    BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**                **Page 17 of 27**
**Motion No.  001**

17 of 27

[* 17]

thereupon performing the surgery, despite his knowledge that the plaintiff was a heavy smoker who refused to quit despite Berookhim's urging, that the plaintiff also suffered from coronary artery disease, and that the plaintiff had undergone cardiac surgery approximately six months before the IPP surgery. Dr. O'Leary stated that these all were factors that Berookhim should have taken into serious consideration before agreeing to perform an elective surgery on the plaintiff, particularly because Berookhim had first consulted with the plaintiff on January 6, 2016, more than one year prior to performing the surgery.

Dr. O'Leary expressly disagreed with Dr. Stahl's opinion that a patient's A1C levels needed only to be lower than 11% before an IPP implant, asserting that, instead, the prevailing standard of care in 2017 was that the threshold A1C level should be 8.5% or lower before performing IPP surgery in a diabetic patient. He averred that the medical literature did not support Dr. Stahl's conclusion. Specifically, he opined that the literature indicated that, for men with diabetes whose A1C levels are greater than 8.5%, the risk for developing post-operative infection following penile implant surgery increases, and for diabetic men with A1C levels greater than 10%, the risk of infection increases by 12.1%. Dr. O'Leary also criticized Berookhim for being unaware of the plaintiff's actual A1C levels on March 2, 2017, when he performed the surgery, instead relying on Dr. Abascal's testing from several weeks earlier, which reported levels of both 8% and 10.4%, with no indication of when those tests actually were performed. He thus concluded that Berookhim departed from good and accepted practice by failing to order an A1C level test as part of his routine preoperative laboratory studies, and proceeding to perform the surgery in the absence of recent test results.

As Dr. O'Leary explained it, not all patients are candidates for elective IPP surgery, "which represents the end-stage therapy for erectile dysfunction." He faulted Berookhim for relying upon Dr. Abascal's "so-called clearance" of the plaintiff for surgery, noting that Dr. Abascal only cleared the plaintiff to discontinue taking his heart medication "in anticipation" of the surgery, but did not specifically clear him for the surgery. In particular, he noted that,

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 18 of 27**

contrary to Dr. Stahl's interpretation of Dr. Ascabal's records, Berookhim himself wrote in his own chart that Dr. Ascabal considered the plaintiff to be a high-risk patient for an otherwise low-risk surgery.

Dr. O'Leary further opined that Berookhim failed to administer the appropriate preoperative, prophylactic antibiotics, which he concluded had contributed to the development of the post-operative infection. He asserted that the standard of care in 2017 was to begin a regimen of Vancomycin two hours prior to surgery and a regimen of Gentamycin one hour prior to surgery, rather than to administer them via an intravenous push subsequent to the induction of general anesthesia. As he characterized it,

> "[i]t is highly unusual to give Vancomycin by IV push because of the significant danger of hypotension. The whole purpose of giving antibiotics well prior to the surgery is to have significant levels of antibiotics flowing through the blood to prevent infection. Therefore, this was a breach of the standard of care for antibiotic prophylaxis and contributed to the development of the post-operative infection."

Dr. O'Leary expressly rejected the Lenox Hill defendants' characterization of the plaintiff as a "noncompliant" patient, or that any delays in reporting or seeking follow-up treatment caused or contributed to the development or exacerbation of the infection. Rather, he opined that it was Berookhim's failure closely to monitor the patient's white blood cell count postoperatively, which he identified as a departure from accepted standards, that led to the worsening of the infection.

In addition, Dr. O'Leary explicitly disagreed with Dr. Stahl that the plaintiff's failure continuously to wear a scrotal support device contributed to a delay in postoperative healing. As he phrased it, "[t]here is nothing in the literature which suggests the routine need for scrotal support and in fact this could conceivably result in malposition or migration of the pump. They are not necessary for the patient's recovery." Crucially, Dr. O'Leary opined that Berookhim should have waited both until the plaintiff's A1C levels improved substantially, and until the plaintiff discontinued smoking for at least four weeks, before undertaking the IPP surgery, and that Berookhim's failure to delay the surgery constituted a departure from good practice that

increased the chance of infection. Moreover, while Dr. O'Leary concurred with Dr. Stahl that smoking is not a complete contraindication to proceeding with IPP surgery, it nonetheless is a factor that must be taken into consideration as to whether a patient is a candidate for that type of surgery, or whether the risks were too significant in light of a patient's other co-morbidities. He stated that, when a patient has as many co-morbidities as the plaintiff had, "it is the physician's responsibility to take as many precautions as necessary to achieve a favorable outcome, including reducing the glycemic index, eliminating the smoking and any other factor that can be controlled before performing surgery." Hence, he concluded that, not only was the plaintiff a poor candidate for IPP surgery, he was not sufficiently stable from a medical standpoint to undergo it due to pre-existing co-morbidities and that, "[a]s a direct consequence of [undergoing] surgery on the plaintiff when he was not medically fit to undergo the procedure," the plaintiff "predictably developed a significant post-operative infection necessitating removal of the penile implant, multiple surgeries and ultimately a partial amputation of his penis."

Although, in reply, the Lenox Hill defendants submitted an attorney's affirmation, in which counsel characterized Dr. O'Leary's opinions as speculative, conclusory, and not supported by the record, the court disagrees with that characterization. Rather, Dr. O'Leary unambiguously and specifically disagreed with Dr. Stahl's relevant conclusions and, hence, the plaintiff raised a triable issue of fact as to whether Berookhim departed from good and accepted practice in recommending and proceeding with the IPP surgery, and in providing postoperative monitoring and treatment. Hence, that branch of the motion seeking summary judgment dismissing so much of the medical malpractice cause as was premised on those departures must be denied. Nonetheless, since the Lenox Hill defendants established Beroohim's prima facie entitlement to judgment as a matter of law with respect to so much of the medical malpractice cause of action as was premised upon his alleged failure (a) properly to perform the IPP surgery in a sanitary manner, (b) timely to diagnose a postoperative infection, and (c) timely refer the plaintiff for hyperbaric oxygen therapy, and Dr. O'Leary did not render an opinion as to

**805238/2019  BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 20 of 27**

these issues, the branches of the motion seeking to dismiss those portions of the medical malpractice cause of action asserting those claims against Berookhim must be granted.

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Nonetheless, "expert testimony concerning what a reasonable person would have done in plaintiff's position is not necessary to maintain a cause of action premised upon lack of informed consent" (*Gray v Williams*, 108 AD3d 1085, 1087 [4th Dept 2013]; *see Hugh v Ofodile*, 87 AD3d 508, 509 [1st Dept 2011]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000]).

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nonetheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with such a claim where a patient signs

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 21 of 27**

21 of 27

a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

"A failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456). In addition to invasive diagnostic testing arising from a failure properly to diagnose a medical condition, the administration of nonindicated medications arising from a misdiagnosis may also be the basis for a lack of informed consent cause of action (*see Lyons v Vassar Bros. Hosp.*, 30 AD3d 477, 478 [2d Dept 2006]).

Dr. Stahl asserted that the information provided by the Lenox Hill defendants to the plaintiff was qualitatively sufficient, and that the consent that Berookhim obtained from the plaintiff to proceed with the subject surgery thus constituted a fully informed consent. As Dr. Stahl characterized it, the plaintiff and Berookhim had a "lengthy discussion" on May 25, 2016 concerning surgery for the placement of a penile prosthesis, which included a discussion about the placement of a three-piece inflatable device, a two-piece prosthesis, and a malleable prosthesis, after which Berookhim recommended employment of the three-piece inflatable device, an option that Berookhim asserted was "known" to provide the greatest patient comfort. Upon his review of the relevant records and Berookhim's deposition testimony, Dr. Stahl asserted that Berookhim also informed the plaintiff during this discussion of the risks and benefits of an IPP, advising him that the proposed surgery posed a 1% implant infection rate and that, if infection occurred, removal of the device would be necessary. He further averred that the plaintiff was informed of the potential for loss of phallic length associated with the implantation of an IPP, of the effective lifespan of the device, of the likelihood of aesthetic changes, and of the potential for a mechanical malfunction.

**805238/2019 BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No. 001**

**Page 22 of 27**

[* 22]

As Dr. Stahl characterized the relevant records, on July 13, 2016, Berookhim documented that the plaintiff had posed multiple questions concerning the three-piece IPP, including infection risk, the need for preoperative antibiotics, and pre-surgery hygiene, in response to which Berookohim allegedly again advised the plaintiff of the 1% risk of infection, and also advised him of a 1% to 5% risk of urethral injury. According to Dr. Stahl's review of the deposition testimony and medical records, that discussion also included a comparison of the IPP procedure to a semirigid implant, and a statement by Berookhim that, in the event of urethral injury, an IPP can be replaced with a semirigid device. Berookhim also purportedly advised the plaintiff that an IPP can last 10 to 15 years, but that, in some cases, it might last only 5 years or less, and that some men actually had reported penile shortening, rather than an enlargement, after the placement of an IPP. According to Dr. Stahl, Berookhim told the plaintiff that he needed to undergo a stress test prior to undergoing surgery. Moreover, Berookhim testified at his deposition that he again told the plaintiff of the need for glycemic control, and that the plaintiff's target A1C reading was 10%, but optimally should be less than 9%, although even a level of up to 11% was an acceptable reading for diabetic patients in advance of surgery. According to Berookhim, he spent 70 minutes that day examining the plaintiff and discussing these risks and benefits with the plaintiff. Berookhim testified at his deposition that, on July 27, 2016, he again discussed with the plaintiff the need for glycemic control and the plaintiff's need to stop smoking, although Berookhim further testified that cessation of smoking was not required to proceed with the procedure. In addition, according to Berookhim, he had a similar discussion with the plaintiff shortly before the March 2, 2017 surgery, concerning risks of infection and failure of the IPP device. At approximately 1:10 p.m. on March 2, 2017, the plaintiff signed an informed consent form indicating that he had been advised of the risks and benefits of, and the alternatives to, the procedure, and also signed an anesthesia consent form.

According to the Lenox Hill defendants, at the plaintiff's June 3, 2017 follow-up appointment, Berookhim informed the plaintiff of the risks of progressive necrosis if the infection

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 23 of 27**

[* 23]

23 of 27

that he presented on that date were to be left untreated, and that, given the changes to the plaintiff's skin, the implantation of another device could contribute to worsening necrosis and phallic shortening.  They further averred that Berookhim obtained the plaintiff's informed consent to the removal of the infected penile prosthesis at 10:05 a.m. on that date, and that the plaintiff thereupon was transferred to the operating room at 10:26 a.m.

Although the Lenox Hill defendants established their prima facie entitlement to judgment as a matter of law in connection with the lack of informed consent cause of action, the plaintiff raised triable issues of fact in opposition to that showing with Dr. O'Leary's affidavit, in which he asserted that it was not clear that Berookhim ever had a serious discussion with the plaintiff concerning less invasive, alternative treatments to surgery, for example, penile injections.  As he explained it, intracavernosal injection therapy "is a widely used and well tolerated treatment for ED," and that, while Berookhim's notes suggested that the plaintiff "was not interested" in injection therapy, the notes did not indicate that Berookhim and the plaintiff had a serious discussion about this "highly effective treatment option."  Dr. O'Leary noted that, in many parts of the country, at least one attempt at injection therapy must be documented before penile prosthetic surgery will even be approved for insurance coverage.

With respect to the risks of IPP surgery, Dr. O'Leary agreed with Drs. Stahl and Berookhim that the risk for a postoperative infection was only 1-2%, and that it was a very simple procedure, but only with respect to an otherwise healthy patient, such as one not suffering from diabetes and who was not an active smoker.   However, Dr. O'Leary noted that Berookhim never told the plaintiff that the risk of infection in a patient with uncontrolled diabetes was *significantly* greater than that.  As he explained it, the applicable standard of care requires a physician to have a very frank discussion with all patients about the risk of postoperative infection, a discussion that is particularly critical for patients with diabetes, who "must be told specifically the increased percentages of risk of infection based on their co-morbidities because the risk factor increases so dramatically."  Hence, Dr. O'Leary concluded that it was not enough

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 24 of 27**

for Berookhim to have told the plaintiff, who indeed had such significant co-morbidities, that the risk of infection was only 1%. He noted that Berookhim never told the plaintiff that, based on his unique medical condition, including uncontrolled diabetes, coronary artery disease, and active smoking, his risk of contracting a post-operative infection was greatly increased from the usual 1-2% applicable to healthy patients. Moreover, at his deposition and in his verified bill of particulars, the plaintiff asserted that, had he been informed of the actual risk of infection, with the concomitant need to remove the implant, and the consequent risk of the need for a partial penectomy, he never would have undergone the IPP procedure.

The plaintiff's submissions were sufficient to raise a triable issue of fact and, hence, that branch of the Lenox Hill defendants' motion seeking summary judgment dismissing the lack of informed consent cause of action insofar as asserted against Berookhim must be denied.

A cause of action premised upon negligent hiring must be supported by proof that the defendants either "knew, or should have known," of their employees' "propensity for the sort of conduct which caused the injury" (*Sheila C. v Povich*, 11 AD3d 120, 129-130 [1st Dept 2004]; *see Kuhfeldt v. New York Presbyt./Weill Cornell Med. Ctr*., 205 AD3d 480, 481-482 [1st Dept 2022]). Dr. Stahl opined that all of LHH's employees were properly vetted, trained, and credentialed. Inasmuch as the plaintiff did not address this issue in his opposition papers, he failed to raise a triable issue of fact in opposition to the Lenox Hill defendants' prima facie showing in this regard. Hence, that branch of those defendants' motion seeking summary judgment dismissing the negligent hiring, training, and supervision cause of action insofar as asserted against them must be granted.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment, but not for negligent treatment provided by an independent physician, as when the physician is retained by the patient himself'" (*Valerio v Liberty Behavioral Mgt. Corp*., 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see*

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 25 of 27**

25 of 27

*Hill v St. Clare's Hosp.*, 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp.*, 164 AD3d 1211, 1213 [2d Dept 2018]). Berookhim was an employee of LHH when he allegedly committed the acts complained of here. Hence, to the extent that there are triable issues of fact with respect to whether Berookhim departed from good and accepted practice and failed to obtain the plaintiff's fully informed consent to the procedure, there are triable issues of fact as to LHH's vicarious liability with respect to those claims.

The court notes that the plaintiff, without prior approval of the court, submitted a sur-reply in response to the Lenox Hill defendants' reply papers. Under Rule 14(c) of the Rules of the Justices of the Supreme Court, Civil Branch, New York County (Local Rules), "[t]he CPLR does not provide for sur-reply papers, however denominated. . . . Material presented in violation of this Rule will not be read," unless the court grants prior approval ftherefor. The court thus has not considered the plaintiff's sur-reply, although it further notes that the consideration thereof has been rendered unnecessary by virtue the court's determination on this motion (*see U.S. Bank N.A. v RJF 110 Realty LLC,* 2016 NY Slip Op 31273[U], 2 n 1, 2016 NY Misc. LEXIS 2512, *2 n 1 [Sup Ct, N.Y. County, Mar. 11, 2016]).

Accordingly, it is,

ORDERED the motion is granted only to the extent that the defendants Boback M. Berookhim, M.D., and Lenox Hill Hospital are awarded summary judgment dismissing the negligent hiring and retention cause of action insofar as asserted against them, and so much of the medical malpractice cause of action insofar as asserted against them as was premised upon their alleged failure properly to perform the surgery that is the subject of this action in a sanitary manner, their alleged failure timely to diagnose a post-operative infection, and their alleged failure timely to refer the plaintiff for hyperbaric therapy, those claims are dismissed insofar as asserted against those defendants, and the motion is otherwise denied; and it is further,

ORDERED that that all remaining parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 26 of 27**

26 of 27

December 3, 2024, at 11:00 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

| 10/25/2024 | | JOHN J. KELLEY, J.S.C. |
|:---:|:---:|:---:|
| **DATE** | | |

| CHECK ONE: | | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | | ☐ OTHER |
| APPLICATION: | | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | | ☐ REFERENCE |

**805238/2019   BROWN, RALPH V. vs. BEROOKHIM, M.D., BOBACK M.**
**Motion No.  001**

**Page 27 of 27**

27 of 27

[* 27]