[634 NYS2d 101]

KATHLEEN O'SULLIVAN, as Administratrix of the Estate of
RICHARD O'SULLIVAN, Deceased, Appellant, v PRESBYTE-
RIAN HOSPITAL IN THE CITY OF NEW YORK AT COLUMBIA
PRESBYTERIAN MEDICAL CENTER et al., Respondents.

First Department, November 30, 1995

## APPEARANCES OF COUNSEL

*Stephen R. Krawitz* of counsel *(Frank P. Mangiatordi* and *Stephen R. Krawitz, P. C.,* attorneys), for appellant.

*Laura R. Shapiro* of counsel *(McAloon & Friedman, P. C.,* attorneys), for Presbyterian Hospital and another, respondents.

*Patricia D'Alvia* of counsel *(Martin Clearwater & Bell,* attorneys), for Frederick S. Mendelsohn, respondent.

## OPINION OF THE COURT

NARDELLI, J.

Plaintiff's decedent, Richard O'Sullivan, 44 years old, had never been married or had a significant relationship with a woman. He lived with his brother, a hemophiliac, who was decedent's only significant friend. Over a period of some 20 years decedent steadily lost weight and in addition to this weight loss, suffered from stress-induced bouts of acne. He also had withdrawn from most normal daily activities spending most of his time at home with his brother. His stress prevented him from working or from socializing. He also expressed anxiety concerning his physical sexual attributes.

At the urging of his sister and his personal physician, decedent sought psychiatric treatment from Presbyterian Hospital making initial telephone contact on February 15, 1989. Decedent was interviewed on February 28, March 7, and March 14, 1989 by a third-year medical student who was under the supervision of defendant. Despite his abnormally low weight, Mr. O'Sullivan was not given a physical examination. Furthermore, neither Dr. Mendelsohn nor any other hospital staff contacted his private physician for any review of his medical records. While decedent's sister called the hospital numerous times, no one interviewed her to get any background information about her brother.

On April 17, when Mr. O'Sullivan appeared at the hospital for group therapy, which had been recommended by the third-year medical student and Dr. Mendelsohn, he was rejected for the group because of his "passive" personality. On April 26, Mr. O'Sullivan again appeared at the hospital for assignment to a group, but left with no assignment being made. No other medical or psychiatric treatment was planned or rendered to him on an interim basis. He was not referred to a therapist or given any psychotropic medication. On May 3rd or 4th, he was advised in a telephone call from a doctor at the hospital that he had been rejected for yet another group then in progress. He was told that another group was forming in July for which he might qualify. He again was not offered interim therapy or medication. Three days later, on May 7, 1989, Richard O'Sullivan committed suicide by hanging himself.

We note that the action was discontinued against defendants Kass, Mellman and Foyt and during the pendency of this appeal there was a settlement and a withdrawal of the appeal against defendants Presbyterian Hospital and Goldman. Thus, the only remaining defendant is Dr. Mendelsohn.

When a psychiatrist chooses a course of treatment, within a range of medically accepted choices, for a patient after a proper examination and evaluation, the doctrine of professional medical judgment will insulate such psychiatrist from liability. The psychiatrist, as the general physician, may not be held liable for a mere error in professional judgment. "A physician's duty is to provide the level of care acceptable in the professional community in which he practices (*Toth v Community Hosp.*, 22 NY2d 255). He is not required to achieve success in every case and cannot be held liable for mere errors of professional judgment (*Pike v Honsinger*, 155 NY 201; *DuBois v Decker*, 130 NY 325). The 'line between medical judgment and deviation from good medical practice is not easy to draw' particularly in cases involving psychiatric treatment (*Topel v Long Is. Jewish Med. Center*, 55 NY2d 682, 684)." (*Schrempf v State of New York*, 66 NY2d 289, 295.)

The IAS Court relied on these standards to grant defendant summary judgment in this malpractice action. However, in so doing, it erred in drawing the "line between medical judgment and deviation from good medical practice" (*Topel v Long Is. Jewish Med. Ctr., supra*, at 684), making factual determinations on a record before it which contained clear factual issues.

Summary judgment is a drastic remedy and should not be granted when there is doubt as to the existence of a material

triable issue of fact (*see, Rotuba Extruders v Ceppos*, 46 NY2d 223, 231). On a motion for summary judgment, the court should accept as true the evidence submitted by the opposing party and any evidence of the movant which favors the opposing party (*Weiss v Garfield*, 21 AD2d 156, 158). The nisi prius court erred, therefore, in accepting the assertions of defendant and his experts, while disregarding the evidence favorable to the plaintiff.

It is true that defendant in his motion for summary judgment noted that decedent had not expressed any suicidal ideation. He submitted supporting experts' affidavits concluding that his behavior did not depart from accepted standards of psychiatric practice. However, Dr. Milone, a board-certified psychiatrist and plaintiff's expert, opined, after a full review of the record, that the care decedent received at the hospital was causally related to his suicide, and that defendant's care deviated from acceptable standards of medical care. Plaintiff's expert found, specifically, that defendant's deviations included failing to diagnose a major depression, failing to formulate a comprehensive and interdisciplinary treatment plan for Mr. O'Sullivan, failing to detect the severity and acuteness of his presenting problem, failing to have him undergo a physical examination, failing to contact Mr. O'Sullivan's treating physician about decedent's weight problem, failing to assign Mr. O'Sullivan a primary therapist and failing to refer him for psychotropic medication.

Further, plaintiff submitted, in opposition to defendant's application, three separate evaluations of defendant's care of Mr. O'Sullivan issued by the State of New York Commission on Quality of Care for the Mentally Disabled, the University of Rochester Medical Center, and the New York State Office of Mental Health, New York City Regional Office.

The Commission on Quality of Care for the Mentally Disabled and the Mental Hygiene Medical Review Board notified the hospital that, after an investigation, "Mr. O'Sullivan received less than adequate outpatient care at Columbia Presbyterian Hospital". The letter noted, *inter alia*,

"In reviewing the course of Mr. O'Sullivan's care, the Commission and Board were critical of the following:

"For nearly a two and one-half month period, Mr. O'Sullivan *received no treatment*, rather he was 'ping-ponged' from one evaluator and group to another;

"Mr. O'Sullivan demonstrated signs and symptoms of a major depression, yet *he was not diagnosed* as having such, nor treated for such;

"Despite his being severely underweight, *no physical examination* of Mr. O'Sullivan *was conducted nor arranged for, and the facility did not contact previous service providers* to determine their history in treating Mr. O'Sullivan and impressions concerning his condition; and

*"Mr. O'Sullivan's comprehensive treatment plan was not complete."* (Emphasis added.)

The Chairman of the Department of Psychiatry and a Professor of Psychiatry at the University of Rochester Medical Center also conducted a review and evaluation of decedent's treatment and concluded, *inter alia*, that:

"1. A more thorough and perhaps prolonged evaluation might have revealed that a more acute process was taking place with the patient. There is some evidence of continuing fairly precipitous weight loss, for example from Dr. Bernstein. In addition to obtaining a longer, stronger, and more thorough history, information from the patient's personal physician, from his family, and perhaps from others might have been helpful in assuring that an accurate portrayal of the patient and his background were going into the diagnostic formulation. *There was significant information lacking in this patient's evaluation resulting in the incomplete formulation of his current situation and treatment needs.*

"2. The patient might have been assigned a temporary responsible and identifiable therapist to help guide him through the various evaluation processes for the treatment modalities that were being considered for him. This could have offered him direct support at a time when the several groups were found unsuitable for him. With the phone call of May 4, he was told that he would be contacted after July 1st and there was no explicit reaching out to support him." (Emphasis added.)

Finally, the New York State Office of Mental Health cited eight deficiencies related to the quality and standard of care received by Richard O'Sullivan. These were, for the most part, duplicative of those enumerated in the other evaluations, i.e., that the patient's needs were not adequately evaluated, physical examinations were not conducted and that a protracted period of time was allowed to elapse before admission or referral to appropriate services without adequate follow-up or treatment during this period.

Given this evidence submitted by the plaintiff, raising issues as to defendant's possibly deficient diagnosis and treatment, while the IAS Court was correct in concluding that defendant

would not be liable for mere errors in professional judgment, there was no basis for it to find, as a matter of law, that defendant conducted a competent examination and evaluation process and that, therefore, a causal relationship between the alleged negligence and the suicide was "at best tenuous speculation". Liability may not be imposed "for honest errors in medical judgment" but "can and should ensue if that judgment was not based upon intelligent reasoning or upon adequate examination so that there has been a failure to exercise any professional judgment" (*Snow v State of New York*, 98 AD2d 442, 447, *affd for reasons stated below* 64 NY2d 745).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Ira Gammerman, J.), entered on or about April 16, 1993, granting defendants' motion for summary judgment dismissing the complaint, should be reversed to the extent appealed from, on the law, the motion denied and the complaint reinstated as against defendant Mendelsohn, with costs and disbursements payable to plaintiff-appellant.

Ross, J. P., Asch and Williams, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on or about April 16, 1993, reversed to the extent appealed from, on the law, the motion denied and the complaint reinstated as against defendant Mendelsohn, with costs and disbursements payable to plaintiff-appellant.