**Moss v Mount Sinai Beth Israel**

2024 NY Slip Op 34559(U)

December 5, 2024

Supreme Court, New York County

Docket Number: Index No. 805392/2017

Judge: John J. Kelley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. JOHN J. KELLEY**      PART     **56M**

*Justice*

--------------------------------------------------------------------------------X

KATHY MOSS, as Administrator of the Estate of ESTHER MOSS, Deceased,

           Plaintiff,

- v -

MOUNT SINAI BETH ISRAEL, BETH ISRAEL MEDICAL CENTER, and MOUNT SINAI HEALTH SYSTEM, INC.,

           Defendants.

--------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 805392/2017 |
| **MOTION DATE** | 10/15/2024 |
| **MOTION SEQ. NO.** | 005 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 005) 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191

were read on this motion to/for     SUMMARY JUDGMENT (AFTER JOINDER) .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted medical practice, and to recover damages for wrongful death, the plaintiff moves pursuant to CPLR 3212 for summary judgment on the issue of liability against the defendants. The defendants oppose the motion. The motion is denied.

The crux of the plaintiff's claim is that, during the October 20, 2015 admission of her decedent, Esther Moss, to the defendant hospital Beth Israel Medical Center (BIMC), a division of the defendants Mount Sinai Beth Israel and Mount Sinai Health System, Inc., radiologists employed by BIMC failed to observe a subdural hematoma on a magnetic resonance imaging (MRI) scan of her decedent's head that had been caused by a fall earlier that day, thus delaying the decedent's withdrawal from the anticoagulant drug Coumadin (warfarin). The plaintiff further alleged that BIMC emergency room physicians negligently failed timely to refer her for a neurology consultation. She asserted that, by retaining her decedent on a maintenance dosage of Coumadin after her decedent had fallen and struck her head, and failing immediately to refer

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
Motion No. 005

Page 1 of 25

her to a neurologist, her decedent went into a coma while still at BIMC several days after her admission, and ultimately died from a brain bleed on November 6, 2015.

In her complaint, the plaintiff alleged that the defendants were negligent in that their medical and health-care personnel failed properly to read and interpret radiographic studies, and, thus, failed to make a proper and adequate diagnosis. The plaintiff further alleged that, based on these departures from good and accepted practice, the defendants' personnel failed to render proper, adequate, and immediate medical care and treatment, which included their failure properly to discontinue maintenance medications. In addition, she alleged that the defendants' personnel "failed to perform indicated medical procedures; performed improper and/or contraindicated medical procedures; [and] negligently and carelessly and in violation of good, sound medical custom and practice failed to exercise due and reasonable care under the circumstances, so as to avoid injuring" the plaintiff's decedent.

In her bill of particulars, the plaintiff first asserted that she would be relying upon the doctrine of res ipsa loquitur. She also reiterated the allegations set forth in the complaint, and further alleged that the defendants neglected to perform adequate, thorough, and timely examinations of her decedent, failed properly to read and interpret the October 20, 2015 MRI scan, and, thus, failed timely to diagnose the plaintiff's decedent with a cranial subdural hematoma or hemorrhage upon her admission to BIMC on October 20, 2015.

In addition, the plaintiff alleged in her bill of particulars that the defendants departed from good and accepted practice in failing timely to perform a computed tomography (CT) scan, to test for blood platelets, or to administer a blood test to measure the decedent's international normalized ratio (INR) for the purpose of determining whether her blood had become too thin to withstand an ongoing cranial hematoma or hemorrhage. With respect to the CT scans that ultimately were performed, the plaintiff alleged that the defendants misread or misinterpreted those scans, instead reaching and relying upon a "hasty, superficial, incorrect, unsupported diagnosis and further proceeding upon the basis of that incorrect diagnosis by placing a

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 2 of 25**

2 of 25

heightened concern on the patient's cardiologic condition as opposed to the more immediate neurologic injuries." She further alleged that the defendants' personnel committed malpractice:

"[i]n failing and neglecting to adequately, properly and timely take heed and give appropriate consideration, credence and medical significance to the consultation and radiographic reports that were received, as well as to the [decedent's] relevant medical history and complaints, signs and symptoms, including low platelets, increased INR levels, anticoagulant medications including heparin and warfarin, the interplay between INR levels, low platelets, warfarin and heparin, and an intra-cranial bleed, and . . . the CAT Scan of October 20th, 2015 revealing intra-cranial hemorrhage, follow-up CAT Scan of October 23rd, 2015 revealing increased intra-cranial hemorrhage as compared to prior study; in failing and neglecting to adequately, timely and properly review all CAT Scan films; in failing to request the October 20th, 2015 CAT Scans be reviewed again in view of the findings of the October 23rd, 2015 CAT Scans demonstrating an intra-cranial hemorrhage; in failing and neglecting to timely institute proper and adequate medical treatment as of October 20th, 2015 by ceasing all prescriptions of coumadin, or other like anti-coagulants; [and] in failing to transfer the patient on October 20th, 2015 to ICU in view of her intra-cranial hemorrhage and elevated INR levels."

Furthermore, the plaintiff alleged in her bill of particulars that the defendants' personnel committed malpractice when the ignored the October 23, 2015 advice and recommendations of family medicine practitioner Aubrey Raimondi, M.D., to discontinue the administration of Coumadin to the decedent. She also faulted the defendants for failing to request proper and appropriate consultations with a neurologist and internist.

Importantly, the plaintiff also alleged in her bill of particulars that the defendants failed properly to correlate and evaluate the findings and patient history that they obtained, which reflected the presence of elevated INR levels, with the ongoing administration of Coumadin or other anti-coagulation drugs, which should have been extremely concerning for a patient who had just fallen and struck her head. In addition, she contended that the defendants were negligent in failing to administer vitamin K or fresh blood plasma intravenously from October 23, 2015 through October 26, 2015, after they finally recognized the presence of a cranial hemorrhage, or to consider surgical intervention to relieve cranial pressure, and instead prescribed and treated the decedent with heparin, another anticoagulant drug, despite Dr.

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 3 of 25**

3 of 25

Raimondi's recommendation to cease all anticoagulant therapy, a recommendation that they did not impart to the decedent or her family members.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr*., 64 NY2d 851, 853 [1985] [citations omitted]).  The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212).  The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp*., 18 NY3d 499, 503 [2012]).  In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]).  Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503).  A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc*., 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]).  Thus, a moving plaintiff does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the defense.  He or she must affirmatively demonstrate the merit of his or her claim (se*e Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism,* 135 AD3d 458, 462 [1st Dept 2016]).

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

**Page 4 of 25**

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]; *see Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp.*, 10 AD3d 521, 522 [1st Dept 2004]). Where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and such insufficient care or delay proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . . pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

A plaintiff moving for summary judgment in a medical malpractice action must make a prima facie showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to the defendant's departure from accepted standards of medical practice (*Alvarez v Prospect Hosp.,* 68 NY2d 320, 324 [1986]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) and by establishing that he or she was injured by such treatment (*see McGuigan v Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).

To satisfy the burden on a summary judgment motion, a plaintiff must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, if one has been served, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206;.*Joyner-Pack v. Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v*

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

Page 5 of 25

5 of 25

*Ricciardelli*, 40 AD3d 935 [2d Dept 2007]). If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of an expert should specify "in what way" the patient's treatment was improper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital*, 69 AD3d 403, 404 [1st Dept 2010]).

The same standards as apply to a plaintiff's prima facie showing also apply to a defendant seeking to oppose a motion for summary judgment. Thus, the opinion of the defendant's expert must "explain 'what defendant did and why'" (*Ocasio-Gary v Lawrence Hospital*, 69 AD3d at 404, quoting *Wasserman v Carella*, 307 AD2d 225, 226, [1st Dept 2003]). Where a bill of particulars has been served, a defendant must address and rebut specific allegations of malpractice set forth therein (*see Wall v Flushing Hosp. Med. Ctr*., 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr*., 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]). Where the expert's "ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force" (*Diaz v New York Downtown Hosp*., 99 NY2d 542, 544 [2002]; *see Frye v Montefiore Med. Ctr*., 70 AD3d at 24).

The plaintiff established her prima facie entitlement to judgment as a matter of law by submitting the pleadings, the bill of particulars, relevant medical records, transcripts of party and nonparty depositions, a certified autopsy report referable to the decedent, and the expert affirmation of a board-certified psychiatrist and neurologist.

The plaintiff's expert physician opined that the defendants' medical personnel departed from good and accepted medical practice in treating the plaintiff's decedent, and that their departures caused and contributed to the decedent's conscious pain and suffering and, ultimately, to the decedent's comatose condition and death.

Upon review of the medical records and deposition testimony, the plaintiff's expert explained that, on October 20, 2015, the decedent had fallen at home, striking and fracturing her elbow, and striking and injuring her head. The expert noted that the decedent was taken by

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

**Page 6 of 25**

6 of 25

[* 6]

ambulance to the BIMC emergency room, where a CT scan of her head was taken and read by BIMC radiologist Daniel E. Meltzer, M.D., who reported that the scan was negative for any subdural hematoma. The expert further explained that, at the time, the decedent had been on a maintenance dosage of the anticoagulant Coumadin in light of her history of transient ischemic attacks (TIAs). As the plaintiff's expert characterized BIMC's emergency room chart, the decedent's head injury was her chief complaint. The expert further noted that, on October 23, 2015, BIMC radiologist David Liu, M.D., concluded, contrary to Dr. Meltzer's impression, that the October 20, 2015 head CT scan actually reflected the presence of a thin, left-sided subdural hematoma. The plaintiff's expert concurred with Dr. Liu's reading, and opined that the October 20, 2015 scan indeed depicted a thin, left sided subdural hematoma. Consequently, the expert concluded that Dr. Meltzer deviated from good and accepted medical practice in failing to properly read and interpret the October 20, 2015 CT scan, and opined that, had Dr. Meltzer properly read that scan, the decedent's anticoagulant medication regime should and would have immediately been discontinued. The plaintiff's expert further asserted that, upon the discontinuance of anticoagulants, BIMC should have initiated either prothrombin complex concentrate (PCC) or fresh frozen plasma (FFP) therapy to reverse the effects of Coumadin.

More specifically, the plaintiff's expert asserted that, upon reading the October 20, 2015 CT scan, Dr. Meltzer reported having observed "a large subcutaneous hematoma just superior to the right external ear." According to the expert, this condition "would be a strong indication that Ms. Moss struck the right side of her head upon falling." The expert stated that it is well known in the fields of both radiology and neurology that head injuries often involve coup and contrecoup injuries, meaning an initial "blow" and a "counterblow," and that a "coup-contrecoup injury" thus refers to two separate head injuries sustained during the same incident. The expert explained that a coup injury refers to the head injury that occurs directly under the point of impact, while a contrecoup injury occurs on the opposite side of the brain from where the head is struck. The plaintiff's expert further explained that, although these types of injury

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

Page 7 of 25

[* 7]

can occur separately, if the blow is strong enough, the injuries usually appear together as a coup-contrecoup injury, and that a coup-contrecoup injury is more likely if a head strikes a stationary object, such as what occurred to the decedent when her head struck the floor of her bathroom. The expert noted that the side of the decedent's head that contacted the floor sustained a large subcutaneous hematoma, while the opposite side involved the brain internally striking the skull as a result of the blow, causing a subdural hematoma, that is, a contrecoup injury. The plaintiff's expert asserted that, based upon the decedent's fall, the fact that she was on a maintenance dosage of anticoagulants, and the presence of a large right-sided subcutaneous hematoma, "it was imperative to carefully study the film, and specifically to look at the left side for a contrecoup injury. Dr. Meltzer, however, concluded [ ] that there was no acute subdural hematoma bilaterally, there was no midline shift, or extra axial collection." Upon reviewing the October 20, 2015 scan, the plaintiff's expert concluded, however, that there was, in fact, an acute thin left-sided subdural hematoma present thereon, which also was expressly observed and noted by BIMC's Dr. Liu when he reviewed that scan on October 23, 2015. Accordingly, the plaintiff's expert reiterated his conclusion that the "admitted failure by Dr. Meltzer to carefully examine for a contrecoup brain injury and note the left sided subdural hematoma on 10/20/15, was a deviation from good and accepted medical practice."

Although the plaintiff's expert conceded that, "[d]espite the emergency room's reliance on a false negative CT Scan reading," BIMC "appropriately admitted the patient for observation of her head injury since she was on anti-coagulants for her prior history of TIAs," and was "rightly concerned about a 'delayed bleed,'" BIMC nonetheless improperly failed to admit the decedent to the neurology department, and instead placed her under the care of former defendant James McNeill Mumford, M.D., a family practice physician. The expert asserted that, by virtue of the decedent's head injury and anticoagulant regimen, she "needed to be under the care of a neurologist, or at the very least, an immediate involvement of neurology in consultation with family medicine, and placed on a strict nursing neurologic watch," requiring an assessment

**805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**                    Page 8 of 25
**Motion No.  005**

[* 8]

every two hours. The plaintiff's expert opined that BIMC emergency room physician Fahad R. Khan, M.D., as well as Drs. Raimondi and Mumford, departed from good and accepted practice between October 20, 2015 and October 24, 2015, by failing immediately to call for a neurological consultation or transfer the decedent to the BIMC neurology department, instead placing her on "a mere 24-hour nursing neurologic assessment" until the late evening hours of October 24, 2015, when this type of strict watch finally was implemented.

With respect to BIMC's failure immediately to transfer the decedent to the neurology department, the plaintiff's expert explained that BIMC's emergency room resident, May Choi, M.D., as well as the emergency room team of physicians, consisting of Dr. Khan, Carey C. Li, M.D., and Kar-mun Woo, M.D., determined that the decedent's primary complaint was a head injury, with secondary concerns about her social needs to aide in ambulation, and they decided that the decedent should be admitted to the hospital "[g]iven [her] inability to walk and possibility of delayed bleed on coumadin." Moreover, the expert noted that the primary diagnosis was a head injury. The plaintiff's expert expressly opined that, under these circumstances, it was "imperative that Ms. Moss receive neurologic care and treatment to monitor her head injury, and watch for any clinical signs of a delayed bleed in the presence of anticoagulant medication." Although the expert accepted that the decedent's needs for rehabilitation in connection with ambulation were "real," the expert averred that the primary, life-threatening condition was a head injury while on Coumadin, that neurologic care and monitoring thus should have been the prime concern, and that ambulatory rehabilitation services could also have been provided on a neurological floor. As the expert described it,

> "[i]t is difficult to explain how a patient with a fractured elbow and a significant head injury with a large left sided subcutaneous hematoma was neither admitted to orthopedics nor neurology. This is especially true when the BIMC ER physician, Dr. Khan, states in the ER record that the primary diagnosis was a 'head injury.'"

Nonetheless, the expert asserted that, once the decedent was admitted into the family practice department, it was incumbent upon every resident and attending physician in that

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 9 of 25**

department immediately to seek a neurologic consultation, as that was the chief reason for the decedent's admittance into BIMC. The expert thus faulted Dr. Raimondi, as the initial family medicine resident who saw the decedent after the BIMC family medicine department was assigned to the decedent the admission date, for failing to request a neurological consultation or a neurologic nursing watch, and characterized these failures as deviations from good and accepted medical practice. Similarly, the expert faulted Dr. Mumford, who was assigned as the decedent's primary physician in the family medicine department, for failing to request a neurologic consultation or a neurological nursing watch when he saw the decedent on October 21, 2015, October 22, 2015, and October 23, 2015, also characterizing these failures as deviations from good and accepted medical practice.

The expert concluded that a neurologic consultation, conducted pursuant to the standards of care in neurology in 2015, "would have likely and appropriately resulted in an order for a neurological nursing watch," which would have entailed enhanced monitoring for clinical signs of neurologic impairment, such as slurred speech, uneven grip, orientation to time, place, and person, and complaints of headaches. The expert noted that this type of neurologic watch entailed, at a minimum, that decedent be monitored every two hours for such signs and symptoms. Further, the plaintiff's expert opined that such a neurologic consultation would likely and appropriately have resulted in an order for a repeat CT scan either on October 21, 2015 or October 22, 2015, at the latest, to ensure that there was no delayed internal head bleeding, particularly because a repeat scan would have revealed, earlier than Dr. Liu's October 23, 2015 report, the mistake that Dr. Metlzer had made on October 20, 2015, thus providing an earlier opportunity for intervention and the best chance to resolve the effects of the anticoagulants.

In addition, the plaintiff's expert asserted that, on October 23, 2015, Dr. Mumford reported that the decedent had been complaining of headaches over the two days prior to that date, even though the BIMC chart for October 21, 2015 and October 22, 2015 did not report those complaints. Consequently, and also in light of the decedent's medical history and her

805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL
Motion No.  005

Page 10 of 25

10 of 25

anticoagulant medication regimen, the expert concluded that a repeat CT scan should have been conducted on both October 21, 2015 and October 22, 2015. In this respect, the expert opined that the failure of BIMC's nursing staff to record and report the decedent's complaints of on those two days constituted deviations from good and accepted nursing practice. The expert noted that Dr. Mumford himself testified at his deposition that, had he been aware in real time that the decedent had complained of headaches for two consecutive days, he would have ordered an immediate repeat CT scan, since complaints of headaches in this setting would be an indication for a repeat CT scan. Even in the absence of reports of headaches, however, the plaintiff's expert concluded that the decedent's situation demanded proactive monitoring and diagnostic testing. The expert also asserted that, notwithstanding Dr. Meltzer's failure to observe the presence of a subdural hematoma, BIMC staff should have anticipated that a head trauma to an elderly patient on anticoagulants might have caused hemorrhaging, and that BIMC nursing and medical personnel should not have waited for any possible hematoma "to expand to the point where it manifested clinical symptoms such as headaches or agitation."

Upon review of both the October 20, 2015 initial scan, and the October 23, 2015 repeat CT scan, the plaintiff's expert concluded that the later scan revealed a thin left sided subdural hematoma that was larger than the one present on the earlier scan. The expert noted that, shortly after the repeat scan of October 23, 2015, BIMC cardiologist Meir Shinnar, M.D., ordered that all anticoagulant medications be discontinued, a directive that was confirmed after a neurological consultation with physician's assistant Anthony Conrad. As the plaintiff's expert characterized it, "Dr. Mumford inexplicably over-rode that order, and directed that [the decedent's] anti-coagulant regime be continued despite the presence of a growing subdural hematoma." The expert expressly concluded that Dr. Mumford's failure and refusal immediately to discontinue anticoagulant medications on October 23, 2015 constituted a deviation from good and accepted medical practice.

**805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

**Page 11 of 25**

The plaintiff's expert asserted that, inasmuch as the October 23, 2015 CT scan reflected the presence of a thin subdural hematoma located on the left side of decedent's cranium that was no more than 8 millimeters wide, but which had grown in size since the October 20, 2015 CT scan, the hematoma reflected a contrecoup head injury, but did not, at that juncture, cause any midline shift. As the expert explained it, the brain is divided into two hemispheres, with a line running down the middle of the top of the brain that is clearly visible on a CT scan examination. The expert asserted that, as long as the pressure within the cranium is relatively equal on both sides, the "midline" runs down the center, but if one side of the cranium evinces more pressure than the other side, it causes the brain to shift within the cranium and, as a result, the midline marker moves away from the side with the excess pressure, and towards the opposite side of the cranium. The expert continued that, if a hematoma develops and enlarges sufficiently, as it did in the decedent's case, it will create physical pressure on the brain within the closed confines of the skull, and this pressure can cause the midline to shift which, in turn, causes the brain to squeeze against the skull on the side opposite the hematoma, resulting in brain damage and intense pain. The expert asserted that the shift was not large enough to be reflected on the October 23, 2015 CT scan but that, nonetheless, "appropriate and timely intervention was absolutely necessary, and would have provided Ms. Moss with a significantly increased chance to recover," since she already was evincing symptoms of a midline shift in the form of headaches, patient agitation, discomfort, slurred speech, and, in an extreme case like hers, a seizure disorder, because the pressure pushing the brain to one side against the skull began to cause brain damage, with the intracranial pressure manifesting itself by those symptoms. The expert averred that, at that time, regardless of the scan results, it was "imperative to do whatever one can in this life-threatening scenario to lessen the pressure, or at the very least, prevent further bleeding," which could and should have been accomplished by the immediate cessation of anticoagulant medication and the implementation of either FFP, PCC, or Vitamin K therapy to reverse the adverse effects of the anticoagulants, characterized

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**                                    **Page 12 of 25**
**Motion No.  005**

by the expert as the best options at that juncture to save the decedent's life. The expert averred that PCC therapy was the "gold standard" in 2015 for the reversal of the adverse effects of anticoagulants, and that it was the only therapy approved by the United States Food and Drug Administration for the "[u]rgent reversal of acquired coagulation factor deficiency induced by warfarin-induced anticoagulation in patients presenting with major acute bleeding (intracerebral hemorrhage-ICH) or a need for urgent invasive surgery or procedure." The plaintiff's expert further explained why PCC therapy was superior to FPP and Vitamin K therapy, even in connection with a general, rather than an urgent, need for reversal of the effects of anticoagulants.

In connection with the failure of BIMC personnel to discontinue the administration of anticoagulants, and commence the administration of FPP or PCC therapy, the plaintiff's expert explained that Coumadin and other anticoagulants, through differing means, prevent the blood from clotting, a necessary bodily function in the face of a bleed. The expert asserted that the only purpose in continuing the administration of Coumadin as of October 23, 2015 was cardiologic in nature, but that, despite the recommendations of neurological physician's assistant Conrad and cardiologist Dr. Shinnar to discontinue anticoagulant therapy, Dr. Mumford nonetheless "ignored this recommendation to devastating effect," a determination that the plaintiff's expert described as "indefensible."

The expert explicitly concluded that each of the deviations from accepted medical practice that he identified and described, specifically, the failure to recognize a subdural hematoma on the initial CT scan, the failure to discontinue the administration of anticoagulants, the failure to commence the administration of PCC, FPP, or Vitamin K, and the failure immediately to order a neurological consultation and a neurological nurse watch, was a "substantial factor in causing Ms. Moss to experience extreme pain, a mid-line shift of her brain caused by the expanding subdural hematoma, seizure disorder, incoherent speech, intense

805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL
Motion No.  005

Page 13 of 25

13 of 25

headaches, resulting in a subsequent coma and death." The expert opined that the decedent's suffering and death were "entirely avoidable."

Contrary to the defendants' contention, it is perfectly appropriate for the plaintiff to redact the name of her retained medical expert from the copy uploaded to the New York State Court Electronic Filing system, while submitting an unredacted copy to the court, as she did here (*see* CPLR 3101[d][1][i]; 3121[b]; *Gobind v Nercessian,* 227 AD3d 464, 465 [1st Dept 2024]; *Vega v Mount Sinai-NYU Med. Ctr. & Health Sys*., 13 AD3d 62, 63 [1st Dept 2004]; *Wilcox v Winter*, 282 AD2d 862, 863 [2d Dept 2001]). Nonetheless, in opposition to the plaintiff's prima facie showing, defendants raised triable issues of fact as to whether any BIMC personnel departed from good and accepted practice, and whether those departures caused or contributed to the decedent's conscious pain and suffering and ultimate death.

In opposition to the plaintiff's motion, the defendants relied on the submissions that the plaintiff had made to the court, while also submitting an attorney's affirmation, a statement of allegedly undisputed material facts, and the affirmation of a board-certified neurologist and psychologist, who opined that no physician, nurse, or other health-care provider at BIMC departed from good and accepted practice, and that nothing that any such medical provider did or did not do caused or contributed to the decedent's injuries or death.

The defendants' medical expert first provided a narrative of the decedent's medical history during the years leading up to 2015, explaining that,

> "[b]eginning in at least 2013, Ms. Moss was suffering from significant and severe cardiac issues, including congestive heart failure, paroxysmal atrial fibrillation and atrial flutter. She had had a pacemaker implanted and been prescribed Coumadin for treatment of her atrial fibrillation. Recent cardiac studies in April and May 2015, including repeat transesophageal echocardiograms (TEE) had revealed a thrombus in the apex of the left atrial appendage (LAA) while an electrocardiogram (ECG) in April 2015 had demonstrated sinus rhythm with a 1st degree AV block and anterior infarct. Additionally, a May 2015 transthoracic echocardiogram (TTE) found that Ms. Moss was suffering from overall moderate decreased left ventricular systolic function with an ejection fraction of 43%, severe concentric left ventricular hypertrophy, severe valvular aortic stenosis, mild aortic stenosis, mild tricuspid regurgitation and minimal pericardial effusion. In addition, Ms. Moss' medical history was significant for transient ischemic

**805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

Page 14 of 25

14 of 25

[* 14]

attacks (TIAs), hypothyroidism, memory difficulty, hyperparathyroidism, overactive bladder and urinary incontinence, constipation, falls, dysphagia, and gait instability."

The defendants' expert essentially reiterated the narrative of the decedent's fall, her presentation to the BIMC emergency department, and her admission to that hospital, noting, in addition, that the decedent's head pain had abated somewhat after she had been administered pain medication, but that she still complained of pain in her neck and right arm, was conversant, and was drinking coffee and eating cake at the time. The expert further asserted that, by 2:45 p.m. on October 20, 2015, emergency room personnel reported that the decedent "was feeling better and resting comfortably," while her vital signs remained stable. According to the defendants' expert, bloodwork studies demonstrated no indication of bleeding, and her INR reading was a "2," which, as the expert characterized it, "demonstrated therapeutic levels from her at-home prescription" of Coumadin. The expert then described Dr. Meltzer's reading of the October 20, 2015 CT scan of the decedent's head, noting that it was taken to evaluate "[h]ead trauma. Large right temporal hematoma. On Coumadin." According to the defendants' expert, that scan was compared to a prior head CT scan, which had been taken without contrast on August 19, 2015. The expert reported that, when Dr. Meltzer interpreted the October 20, 2015 scan, he found a subcutaneous hematoma just superior to the right external ear, with some bilateral chronic lacunar infarcts in the thalami, but no evidence of acute territorial infarct, no midline shift, no extra axial collection, no acute intracranial hemorrhage, and no evidence of an intracranial mass lesion, despite evidence of chronic microvascular ischemic changes.

As the defendants' expert interpreted the relevant medical chart, at 4:45 p.m. on October 20, 2015, the decedent was still complaining of joint pain, back pain, and neck pain, but denied headache, dizziness, or lightheadedness, while her neurological examination reflected that she was oriented, alert, and in no apparent distress, and her motor examination was normal in all extremities, with normal sensation, normal gait, normal coordination, and normal speech. The expert further noted, however, that emergency-room physician Dr. Woo reported that, "given

805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL
Motion No. 005

Page 15 of 25

[the decedent's] inability to walk and possibility of delayed bleed on Coumadin, [the decedent] will need observation versus admit regardless, watch right ear swelling closely, and consider ENT consult if worse to rule out cauliflower ear (currently not so severe), consider MRI/CT for hip if persistent inability to walk to rule out occult hip fracture, PT consult." Moreover, once the decedent was transferred to BIMC's family medicine department, her chart, according to the defendants' expert, reflected that she was seen by Dr. Raimondi, who formulated a differential diagnosis that included neural syncope, versus syncope secondary to arrhythmia, versus a mechanical fall, and reported that there was no evidence of hemorrhage or bony trauma on the CT of the head or the cervical spine. Moreover, the chart reflected that Dr. Raimondi thereafter examined the decedent on October 21, 2015 at 1:00 p.m., and reported that the decedent was feeling much improved.

According to the defendants' expert, the relevant chart indicated that, on October 21, 2015, at both 6:51 a.m. and 12:34 p.m., BIMC personnel conducted neurological assessments that reflected normal results, inasmuch as the decedent was alert and oriented to person, place, and time, her speech was clear and coherent, her pupil size and reaction were normal, her extremity strength was normal, she had no complaints of pain, and was in no distress. At 5:12 p.m. on that date, Dr. Mumford reported that the decedent's fall may have been the result of symptomatic aortic stenosis and, thus, requested that BIMC's cardiology department follow up with the decedent. He also suggested the possibility of catheterization or thoracic surgery for valve replacement, and that, given the history of decedent's falls, she "may need to consider stopping Coumadin." As the defendants' expert further described it, on October 22, 2015, at both 8:04 a.m. and 10:29 p.m., Dr. Mumford conducted additional neurological assessments upon the decedent that generated results that were "grossly normal," while her vital signs remained stable throughout that day, and her INR level had decreased to 1.5 from 2.0 on the previous day. According to the expert's interpretation of the chart, the decedent did not report any pain, other than pressure in her right arm at a level of 8 out of 10 at 9:18 a.m., and

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**                **Page 16 of 25**
  **Motion No.  005**

throbbing in her right arm and shoulder at a level of 5 out of 10 at 2:10 p.m. Dr. Mumford reported that "cardiology recommendations to stop Coumadin appreciated, however, patient has no signs of active bleeding, and given the history of TIAs off the Coumadin, we'll continue for now," an assessment that he claimed to have discussed with the decedent's treating cardiologist, Vivek Reddy, M.D. The expert further noted that BIMC personnel nonetheless did not administer Coumadin on October 22, 2015.

On October 23, 2015, Dr. Shinnar, the BIMC cardiologist, reported that the decedent had experienced no significant overnight events, and expressed her desire to go home, after which he concluded that no invasive procedure was warranted, and wrote that her options with respect to anticoagulants were limited. As the defendants' expert summarized the chart, Dr. Shinnar expressed his view that the decedent presented a very high-risk score for embolization and stroke if she remained off of Coumadin and, thus, his plan was to continue her on Coumadin, the administration of which had been renewed that morning, particularly in light of her INR level of 1.5, reflecting stability from the previous day.

During a neurological assessment that was conducted at 12:29 p.m. on October 23, 2015, the decedent had complained of a mild posterior headache, after which a CT scan of the head, without contrast, was performed at 2:50 p.m., which, as noted revealed a thin, acute left-sided hematoma measuring 8 mm at its greatest width, adjacent to the to the left frontal lobe, but "causing minimal compression" and reflecting "no midline shift." At 4:36 p.m., BIMC personnel from the neurology department consulted on the patient and recommended frequent neurology assessments, which were thereafter conducted every three hours. The discontinuation of Coumadin also was recommended, and the administration of that drug was thereupon discontinued. Subsequently, at approximately 5:30 p.m. on October 23, 2015, BIMC personnel noted that there was a change in the decedent's mental status, inasmuch as she appeared disoriented when awakened, with difficulty following commands. BIMC personnel from the neurosurgery department were called to the decedent's bedside on an emergent basis,

**805392/2017    MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

Page 17 of 25

17 of 25

and a "stat" non-contrast CT scan of the head was performed. According to the defendants' expert, when this scan was compared with the earlier study, there was no change. The neurosurgery providers recommended that the administration of the anti-epileptic drug Keppra (levetiracetam) be withheld, as they reported their concern that Keppra might have caused the change in the decedent's mental status.

The BIMC chart reflected that, on October 24, 2015 at 9:55 a.m., Dr. Mumford reported that the decedent was clinically dehydrated, had experienced a recently altered mental status, and intermittent agitation, and evinced INR levels that had further decreased to 1.4. Dr. Mumford thereupon ordered a repeat CT scan of her head to evaluate her for progression of the subdural hematoma, in light of her altered mental status and questionable delirium and dehydration. While the administration Keppra to the decedent already had been discontinued, at that juncture Dr. Mumford also ordered that the administration of Coumadin was to be discontinued, after which administration of that drug was in fact discontinued for the remainder of the decedent's hospitalization. Dr. Mumford also requested neurosurgery and neurology consultations, which were conducted on that date at 2:16 p.m. and 6:12 p.m., respectively. According to the defendants' expert, the decedent subsequently was found to have rhythmic myoclonus in her right face and arm, lasting up to two to three minutes. BIMC personnel administered 1,000 milligrams of Valproic acid, and performed a video electroencephalogram (EEG). As the expert interpreted the decedent's chart, she sustained more than 10 seizures on October 24, 2015, after which BIMC administered her 2.5 mg of Diazepam, and she was started on a phenytoin loading dose of 20 mg for each kilogram of her weight. The decedent nonetheless continued to experience seizures, which BIMC personnel characterized as "convulsive (myoclonic jerks) status epilepticus."

At approximately 6:00 p.m. on October 24, 2015, BIMC personnel performed a repeat CT scan of the decedent's head, without contrast, which they reported as evincing no change in the size of the hematoma. The decedent's seizures nonetheless continued into October 25,

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 18 of 25**

[* 18]

18 of 25

2015, and anti-seizure medications were increased accordingly. By that date, BIMC nursing staff undertook neurological assessments every two hours. At this time, the decedent's INR readings had decreased even further to 1.2. Yet another CT scan of the decedent's head, without contrast, was performed, and compared with the October 24, 2015 study. As the defendants' expert read the decedent's chart, BIMC medical staff concluded that there was a redemonstration of the left parietal subdural hematoma, with no midline shift or mass effect detected. Thereafter, BIMC staff met with the decedent's family, upon which she was transferred to BIMC's medical intensive care unit for "status epilepticus," was intubated for airway protection, and was sedated. BIMC's neurology department evaluated the decedent, and thereupon commenced monitoring of EEG results.

On October 31, 2015, BIMC pulmonologist Samuel Acquah, M.D., reported his impression that the decedent likely was suffering from acute encephalopathy, due either to lingering sedation or diffuse damage from prolonged generalized tonic clonic seizures. Dr. Acquah further reported that there were still no signs of neurologic recovery, at which point the decedent's family agreed that hospice care would be the most appropriate course of treatment. According to the BIMC chart, on November 1, 2015, a CT-scan of the decedent's head, without contrast, revealed a small left convexity subdural hematoma that had not increased in size since the previous study, and reflected no midline shift. The last documented progress note in the decedent's chart, dated November 5, 2015, which was entered into the chart by the BIMC neurology department, indicated that the decedent was still unresponsive, and that a plan had been formulated to move her to palliative care. The decedent died on November 6, 2015.

The defendants' expert expressly opined that there was no merit to the plaintiff's claim that Dr. Meltzer misread the October 20, 2015 CT scan of the decedent's head. Rather, the expert averred that, upon his or her own review of the films, "even with the benefit of hindsight and in comparison to the October 23rd study, . . . there was no subdural hematoma seen on the October 20, 2015 study," and that, as such, Dr. Meltzer properly read and interpreted the

**805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

Page 19 of 25

scan, implicitly suggesting that it was BiMC's Dr. Liu and the plaintiff's expert who misread the scan. The expert further concluded that the decedent was appropriately admitted to a family medicine service at BIMC because, "[u]nder the circumstances that existed at the time of the patient's admission, there was absolutely no standard of care that dictated the location of her admitting 'floor' and there certainly was no standard that required she be admitted to a neurology floor." The defendants' expert characterized the contrary assertion of the plaintiff's expert as a "fabrication" with "no underlying support," as "there is no bright line rule or algorithm that is followed when admitting a patient to a certain department." The defendants' expert asserted that, rather, a patient's clinicians use their medical judgment to consider the patient's overall condition to make an appropriate admission determination and that, inasmuch as the decedent was an elderly woman "with a host of medical issues, including significant cardiac illness, which needed to be monitored and balanced," admission to a family medicine floor was appropriate, particularly because family medicine physicians and internists are, in fact, trained in the observation and treatment of head injuries. In addition, the expert opined that, once the decedent was admitted to the family medicine services floor, she was appropriately monitored with consultations and provided treatment by appropriate specialists who investigated not only the injuries caused by the decedent's fall, but also the cause of her fall itself, while balancing the need to treat her orthopedic injuries with the treatment of other preexisting health issues.

In addition, the defendants' expert asserted that the defendants did not depart from good and accepted practice by failing to place the decedent on a "neurology watch." The expert concluded that the decedent was appropriately evaluated and assessed from a neurological standpoint at appropriate intervals, and that any and all complaints and pertinent test results were appropriately appreciated and timely acted upon. In this respect, the defendants' expert explained that the standard of care did not require that any of the decedent's doctors or nurses do anything further than what they actually did and, thus, they were not obligated to order more or different laboratory, imaging, or diagnostic tests, or refer the decedent to any other

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

**Page 20 of 25**

20 of 25

specialists. The expert further asserted that there was no indication for any of the clinicians involved in the decedent's treatment from October 20, 2015 through October 24, 2015 to order additional or more frequent neurological monitoring since, during that period of time, the decedent's neurological status, clinical condition, and vital signs were "stable" and her blood work was "reassuring." Hence, the expert concluded that the decedent was not a candidate for "neurological nursing watch," as defined by the plaintiff, and that the standard of care did not require that she be placed under close neurological observation or transferred to the neurology floor. Rather, the expert asserted that the decedent's neurological status was appropriately and properly assessed and monitored at the appropriate frequency at all times.

The defendants' expert also opined that Dr. Mumford's care and treatment of the patient between October 20, 2015 and October 24, 2015 was proper in all respects, and in accordance with good and accepted medical practice. Specifically, the defendants' expert expressly disagreed with the plaintiff's expert in connection with Dr. Mumford's determination to continue the decedent on Coumadin on October 21, 2015 and October 23, 2015, which the defendants' expert characterized as an exercise of good and sound medical judgment. The defendants' expert further concluded that, contrary to the assertions of the plaintiff's expert, the decedent was not administered any Coumadin at all on October 20, 2015, October 22, 2015, or after the BIMC neurology recommended discontinuing it subsequent to the administration of the October 23, 2015 dosage. The defendants' expert further asserted that,

> "it appears that plaintiff is under the erroneous belief that Cardiology disagreed with Dr. Mumford's decision to continue the Coumadin on October 23rd. Instead, Dr. Shinnar, the cardiologist, acknowledged in his comprehensive October 23rd progress note that the patient was at very high risk whether Coumadin was continued or stopped at that time and that he would seek the input of an electrophysiologist to see if there was any technology that could be a solution. Dr. Shinnar did not recommend discontinuing Coumadin at the time. Regardless, Dr. Mumford's decision to keep the patient on anti-coagulants on October 21st and October 23rd was good medical judgment and there was no reason for the hospital staff to disagree or contradict him."

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

Page 21 of 25

[* 21]

21 of 25

In reaching that conclusion, the defendants' expert explained that, in light of the decedent's comorbidities, Dr. Mumford had the difficult task of balancing her high-risk cardiac and neurological needs, particularly because the decedent was in imminent danger of suffering a stroke due to her atrial fibrillation, a danger that was "exponentially increased" due to a known blood clot in her left atrial appendage. Hence, the defendants' expert opined that the decision to continue the decedent on anticoagulants was a proper exercise of medical judgment in reducing the "very real and imminent" risk of stroke, particularly in light of the downward trend of the decedent's INR levels between October 20, 2015 and October 25, 2015, which, according to the expert, demonstrated that she was not anticoagulated at any level that would be of concern for a bleed. In any event, the defendants' expert also concluded that Dr. Mumford again exercised sound medical judgment when he discontinued the administration of Coumadin on October 24, 2015 in response to the change of the decedent's mental status while he awaited further testing results and neurology and neurosurgery consultations.

The defendants' expert expressly disagreed with the conclusion of the plaintiff's expert that repeat CT scans were indicated on October 21, 2015 or October 22, 2015, since, based upon the decedent's examinations, neurological status, blood work, and radiology studies, "there was no index of suspicion of a bleed on October 21st or October 22nd." The defendants' expert went on to explain that,

> "[e]ven hypothetically accepting, plaintiff's unsupported contention that the patient was suffering from a headache on those dates, a headache after a fall, with a negative prior CT-scan and reassuring exams, vital signs and blood work, is not an indication for a repeat CT-scan."

In addition, the expert averred that BIMC personnel administered appropriate treatment even after the October 23, 2015 CT scan revealed the presence of a subdural hematoma, characterizing the neurological care that they provided as "optimal management." The defendants' expert rejected the opinion of the plaintiff's expert that BIMC should have provided

805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL
Motion No. 005

Page 22 of 25

22 of 25

additional treatment, such as the administration of Vitamin K, FFP, or PCC, because such treatment "could have proven catastrophic" in the decedent's case because of her significant comorbidities. Rather, the expert concluded that the decedent was not a candidate for any type of anticoagulation reversal therapy, particularly in light of her downward trending INR levels between October 20, 2015 and October 25, 2015. As the defendants' expert phrased it, "the only treatment available to the patient was medical management of her symptoms, which was delivered in this case, and which was effective as the subdural hematoma diagnosed on October 23, 2015 never increased in size and never caused a midline shift." With respect to this last opinion, the defendants' expert criticized the plaintiff's expert for basing his or her opinions "on the incorrect notion that the patient suffered a midline shift," concluding, after "[a] thorough review of the record, and all radiology reports and films," that the decedent never experienced a midline shift. In light of that conclusion, the defendants' expert rejected, as invalid, the plaintiff's expert's opinion that the decedent had a better chance of survival had Coumadin been discontinued and anticoagulation reversal therapy been implemented prior to the appearance of this allegedly "nonexistent" midline shift.

Ultimately, the defendants' expert concluded that the decedent's death was caused by uncontrollable seizures rather than a subdural hematoma, and that it was "entirely speculative" for the plaintiff's expert to opine that the decedent's subdural hematoma or any minimal change in the size thereof affected her seizure activity. Instead, the defendants' expert asserted that the decedent sustained a contusion from a fall, explaining that, inasmuch as the epileptic activity on her EEG showed bilateral activity, but more so on the right, while the subdural hematoma was on the left, the decedent's right-sided seizure activity, which was the cause of her death, was a consequence of her contusion and fall itself, rather than the subdural hematoma.

In reply, the plaintiff submitted an attorney's affirmation and a counter statement of material facts. In his affirmation, counsel noted that the defendants' retained expert disagreed with their own employee, Dr. Liu, as to whether a left-sided subdural hematoma appeared on

**805392/2017 MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 23 of 25**

[* 23]

23 of 25

the October 20, 2015 CT scan. Counsel further sought to sanction the defendants for their alleged delays in providing outstanding discovery, including many relevant hospital records. In this regard, counsel argued that "[t]hese records go to the heart of one of the Plaintiff's key claims in this case; to wit: financial incentives received by BMIC [sic] for Medicare patients admitted into the IFH clouded their judgment when admitting Ms. Moss, an 88-year-old woman with a head injury on anticoagulants into family health, rather than neurology where she clearly belonged." The plaintiff's attorney thus argued that the defendants should be precluded from offering any defense to the plaintiff's summary judgment motion.

As noted above, the plaintiff established her prima facie entitlement to judgment as a matter of law on the issue of liability, in response to which the defendants raised triable issues of fact, with their expert's affirmation, as to whether they departed from good and accepted medical practice or whether anything that they did or did not do caused or contributed to the decedent's injuries and death. Although the plaintiff now argues that the defendants should be precluded from opposing her motion as a sanction for their alleged failures to respond to or comply with outstanding discovery demands or orders, under most circumstances, including those obtaining in this case, a motion pursuant to CPLR 3126 to impose sanctions for the willful failure to make disclosure must be made prior to the filing of the note of issue and certificate of readiness since, by that filing, a party represents that all discovery has been completed and that there are no outstanding discovery requests (*see Flanagan v Wolff*, 136 AD3d 739, 741 [2d Dept 2016]). The failure to make a motion pursuant to CPLR 3126 prior to the filing of the note of issue and certificate of readiness is deemed a waiver of any contention that an adverse party has failed to meet his or her disclosure obligations (*see id*.; *K-F/X Rentals & Equip., LLC v FC Yonkers Assoc., LLC*, 131 AD3d 945, 946 [2d Dept 2015]; *Marte v City of New York*, 102 AD3d 557, 558 [1st Dept 2013]; *Rivera-Irby v City of New York*, 71 AD3d 482, 482 [1st Dept 2010]). Hence, the plaintiff's motion must be denied.

The plaintiff's remaining contentions are without merit.

**805392/2017  MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No. 005**

**Page 24 of 25**

Accordingly, it is,

ORDERED that the plaintiff's motion for summary judgment on the issue of liability is denied; and it is further,

ORDERED that counsel for the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on January 16, 2025, at 11:00 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

__12/5/2024__
**DATE**

_____
**JOHN J. KELLEY, J.S.C.**

| CHECK ONE: | | ☐ CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
| --- | --- | --- | --- | --- | --- | --- |
| | | ☐ GRANTED | X | DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | | ☐ SETTLE ORDER | | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | ☐ INCLUDES TRANSFER/REASSIGN | | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

**805392/2017   MOSS, KATHY vs. MUMFORD, MD, JAMES MCNEILL**
**Motion No.  005**

Page 25 of 25

[* 25]